UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LOCAL NO. 7 BRICKLAYERS & ALLIED CRAFTWORKERS, *et al.*, | CASE NO. 5:11-cv-1323 |
| Plaintiffs, | MAGISTRATE JUDGE NANCY A. VECCHIARELLI |
| v. | |
| KNOCH CORPORATION, | **MEMORANDUM OF OPINION** Doc. No. 19 |
| Defendant. | |

This case is before the magistrate judge by consent. Before the court is the motion of defendant, Knoch Corporation ("Knoch"), to dismiss the case pursuant to Fed. R. Civ. P. 12(b)(1) ("12(b)(1)") for lack of subject matter jurisdiction. Doc. No. 19. Plaintiffs, Local No. 7 Bricklayers & Allied Craftworkers ("Local 7"), Local No. 7 Bricklayers & Allied Craftworkers Pension Fund, Local No. 7 Bricklayers & Allied Craftworkers Vacation Fund, Local No. 7 Bricklayers & Allied Craftworkers Apprenticeship Fund (collectively, "the Local 7 funds"), Trustees of the Ohio Bricklayers Health and Welfare Fund, Trustees of the Bricklayers & Trowel Trades International Pension Fund, and Trustees of the International Masonry Institute, oppose Knoch's motion. Doc. No. 20. For the reasons given below, the court **GRANTS** Knoch's motion and dismisses the case without prejudice.

I

Local 7 is an Ohio local of the Bicklayers and Allied Craftworkers Union. Knoch is an Ohio corporation headquarted in Stark County, Ohio. The citizenship of the other plaintiffs is not specified in the record. Plaintiffs plead or do not deny the following facts.

J. William Pustelak, Inc. ("Pustelak"), a masonry subcontractor, entered into a collective bargaining agreement ("the CBA") with Local 7 and the Association of Union Mason Contractors of Akron Ohio. The CBA required Pustelak, *inter alia*, to make fringe benefit contributions to the Local 7 funds. The CBA required Pustelak to make these contributions to the Ohio Bricklayers Funds Office ("the Funds office"); which serves as the collection and administrative agency for the Local 7 funds. The CBA also required Pustelak to post a surety bond for the wages and fringe benefits mandated by the CBA. The CBA also provided that failure to post the surety bond could result in withdrawal of the union members from the job site, termination of the CBA, and a strike.

In approximately August 2009, Knoch, a general contractor, bid on the Schumacher Community Learning Center project ("the project"). Incorporated in Knoch's bid was a subcontract bid from Pustelak for masonry work. Eventually, Knoch received the contract for the project.

Before work began on the project, Pustelak found itself in financial difficulties, and it filed for Chapter 11 bankruptcy reorganization. For this reason, Pustelak was not able to post a surety bond as required by the CBA. This put Pustelak's ability to perform under its subcontract in jeopardy, since the CBA permitted the bricklayers to withdraw from the project if Pustelak failed to post the required bond. Pustelak told Knoch about the problem. To resolve the problem, Knoch, Pustelak, and Local 7 arrived at an "Assignment and Dual Check Agreement for the Payment of Fringe Benefit Contributions" (the "Agreement"). The Agreement had five central provisions. First, Pustelak transferred to the Funds Office all of its "rights, title and interest . . . in and to any amounts now or hereafter payable by [Knoch] to [Pustelak] until any and all Contributions owed by [Pustelak] are paid in full . .

2

. ." Agreement, Amended Complaint, Doc. No. 18, p. 1. Second, all money otherwise payable to Pustelak by Knoch for work done on the project would be by a single check made payable to the Funds Office, to satisfy contributions owed by Pustelak. Third, before issuing any check pursuant the Agreement, Knoch was entitled to contact Stoner & Associates or the BAC International Pension Fund to determine the amount, if any, of contributions owed by Pustelak. Fourth, the sums payable to the Funds Office pursuant to the Agreement were the sole property of the Funds Office, not Pustelak, and any such payments received by Pustelak were to be held in trust for the Funds Office. Fifth, in return for the above payments to the Funds Office, the Funds Office agreed to forebear from initiating legal action against Pustelak as long as Pustelak complied with its obligations under the CBA. Knoch signed the Agreement on December 7, 2009, and Pustelak signed on December 23, 2009.[1]

Knoch alleges, and plaintiffs do not deny, that the Agreement was intended to operate as follows. Knoch would make a check payable to the Funds Office for the entire amount of the money it owed Pustelak for work done on the project. The Funds Office would then withdraw from this payment the contributions owed by Pustelak to the benefits funds. The remainder of the payment from Knoch would then be passed to Pustelak, allowing Pustelak, among other things, to pay the salaries of his employees.

During the pendency of the bankruptcy, Pustelak commenced work on the project and continued work into August 2010. In January 2010, Brian Russell, the trustee in bankruptcy ("Trustee"), contacted Knoch and gave it instructions regarding how and to

---

[1] The only available copy of the Agreement provides a space for the Funds Office to sign, but the space is blank.

3

whom the money owed to Pustelak was to be paid.  It also told Knoch that before issuing any check related to Pustelak's work on the project, it must seek direction from the Trustee regarding issuance of the check.  From January 2010 through July 2010, the Trustee permitted Knoch to issue a check on or about the 15th of the month[2] in the amount Pustelak owed for that month in contributions to the benefit funds.  These checks were issued jointly to Pustelak, Inc. and the Ohio Bricklayers Health and Welfare.

From January 2010 through July 2010, Knoch issued 7 checks, with the Trustee's permission, to Pustelak, Inc. and the Ohio Bricklayers Health and Welfare.  At the direction of the Trustee, it also issued 44 other checks at various times to Pustelak and Pustelak's suppliers for amounts owed to Pustelak for work done on the project. The 44 checks were for amounts totaling $1,131,725.63.  Knoch never issued a check in connection with Pustelak's work on the project without the Trustee's approval.

On July 28, 2010, Knoch issued a check for $43,596.82 payable only to Pustelak. Knoch did not contact Stoner & Associates or the BAC International Pension Fund to determine what amount, if any, were owed by Pustelak as contributions to the benefit funds.  Pustelak did not distribute any of the $43,596.82 paid to it on July 28, 2010 to the benefit funds.  At the time Knoch paid the $43,596.82 to Pustelak, Pustelak owed more than $30,000 to the benefit funds.

Soon after payment fo the check for $43,596.82, Pustelak ceased operations.  At that time, it owed the benefit funds about $43,335.19 in unpaid contributions for the months of July 2010 and August 2010.

---

[2] January was an exception because Pustelak began work in the middle of the month.  The January check was issued on the 29th, rather than the 15th.

4

Plaintiffs filed this action on June 28, 2011, alleging federal question jurisdiction. They assert a claim for breach of contract pursuant to § 301 of the Labor-Management Relations Act ("LMRA"), as amended, codified at 29 U.S.C. § 185 ("§ 301"). Knoch moves to dismiss for lack of jurisdiction pursuant to R. 12(b)(1), contending that plaintiffs have no federal cause of action against it. Plaintiffs oppose this motion.

II

When a defendant moves to dismiss on grounds of lack of subject matter jurisdiction, "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.,* 895 F.2d 266, 269 (6th Cir.1990). A court adjudicating a R. 12(b)(1) motion may consider evidence outside the pleadings to resolve factual disputes regarding jurisdiction, and all parties may submit affidavits to supplement the record. *Rogers v. Stratton Industries,* 798 F.2d 913, 916 (6th Cir. 1986). Nevertheless, when the movant contends that the plaintiff has not alleged sufficient facts in the complaint to support subject matter jurisdiction, the court must accept the allegations in the complaint as true. *Jones v. City of Lakeland,* 175 F.3d 410, 413 (6th Cir. 1999).

III

Knoch moves to dismiss for lack of jurisdiction because, according to Knoch, it is not an "employer" within the meaning of the LMRA. Consequently, Knoch concludes, plaintiffs cannot assert a federal claim against Knoch pursuant to § 301. The parties do not dispute that without a federal cause of action this court lacks subject matter jurisdiction over the complaint.

*A.    The LMRA*

Section 301(a), codified at 29 U.S.C. §185(a), provides as follows:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

The goal of the LMRA is "to promote industrial peace through the collective bargaining process by assuring the enforceability by federal courts of collective bargaining agreements between employers and labor unions." *Grand Bassa Tankers, Inc.*, 663 F.2d 392, 396 (2d Cir. 1981). Consequently, § 301 pre-empts all state law claims arising from an alleged breach of a collective bargaining agreement. *Smolarek v. Chrysler Corp.*, 879 F. 2d 1326, 1329 (6th Cir. 1989).

Section 301, however, does not provide federal jurisdiction solely to disputes arising from collective bargaining agreements. In *Retail Clerks International Assoc. v. Lion Dry Goods, Inc.*, 369 U.S. 17, 25-28 (1962), the Supreme Court found that a contract which was not a collective bargaining agreement could be enforced by federal action pursuant to § 301. The Court described the contract at issue as follows:

> It is enough that this is clearly an agreement between employers and labor organizations significant to the maintenance of labor peace between them. It came into being as a means satisfactory to both sides for terminating a protracted strike and labor dispute. Its terms affect the working conditions of the employees of both respondents. It effected the end of picketing and resort by the labor organizations to other economic weapons, and restored strikers to their jobs. It resolved a controversy arising out of, and importantly and directly affecting, the employment relationship. Plainly it falls within § 301(a). "[F]ederal courts should enforce these agreements on behalf of or against labor organizations and * * * industrial peace can be best obtained only in that way." *Textile Workers Union, etc. v. Lincoln Mills, etc.*, 353 U.S. 448, 455 (1957).

*Id.* at 28.

The question becomes, then, which contracts, in addition to collective bargaining agreements, may be enforced by a federal cause of action pursuant to § 301? In *N.L.R.B.*

6

*v. United Ins. Co. of America*, 390 U.S. 254, 256 (1968), the Supreme Court noted that Congress had narrowed the range of contracts which might provide federal jurisdiction pursuant to § 301.  Earlier, in *N.L.R.B. v. Hearst Publications*, 322 U.S. 111 (1944), the Court found that contracts with newspaper distributors, who were independent contractors of the newspaper publisher, were within the purview of § 301.  Congress responded by amending the LMRA to specifically exclude contractors from the definition of "employee" in the act.  The Supreme Court concluded from the Congressional response that the purpose of the amendment was to require courts and the National Labor Relations Board to apply common-law agency principles in distinguishing between employees and independent contractors under the LMRA.  *N. L. R. B. v. United Ins. Co. of America*, 390 U.S. 254, 255 (1968).  Consequently, only disputes based on contracts between "employers" and "employees," as those terms are understood at common law, were given federal jurisdiction by § 301.

Circuit courts have further narrowed the range of contracts which might be enforced by federal action pursuant to § 301.  In *Grand Bassa Tankers*, the Second Circuit found that for a contract other than a collective bargaining agreement to fall within the reach of § 301, the contract must be between an employer and a union representing the employer's own employees.  *Grand Bassa Tankers*, 663 F.2d at 398.  In reaching this conclusion, the Second Circuit wrote the following:

> [T]he important point is that the agreement, although not a traditional collective bargaining contract, was a labor contract governing certain terms and conditions of the employer's relations with its employees.  Following *Retail Clerks*, agreements of the same type between labor organizations and employers relating to the latter's employees have been enforced by federal courts, exercising their jurisdiction under s 301(a).
>
> Of the hundreds of actions invoking federal jurisdiction under the employer-labor

7

>organization contract clause of § 301(a) we have not found any case which did not involve an agreement relating to the employer's relationship with its own employees. . . . The reasonable conclusion to be drawn from the legislative history of § 301(a) and numerous decisions interpreting its employer-labor organization contract clause is that the term "employer" therein refers to the person or entity employing persons who are the subject of the contract with the labor organization and that Congress did not intend to create federal jurisdiction over all contracts between labor organizations and others merely because they happened to be employers. Such an interpretation, carried to its logical extreme, would entitle one party to sue the other for breach or enforcement of a contract for the sale of an automobile, as long as one was an employer and the other a labor organization. Surely Congress did not intend to create such all-inclusive federal jurisdiction when it enacted § 301(a).

*Id.* at 398 (citations and footnote omitted). The court concluded, "The concept that, absent an employer-employee relationship between the parties, § 301(a) should nevertheless be interpreted to embrace a suit to enforce any contract aimed at promoting 'labor peace,' even between third parties . . . would substitute a loose, possibly unworkable standard for what Congress intended." *Id.* at 399.

Courts within the Sixth Circuit have cited *Grand Bassa Tankers* with approval. *See, e.g.*, *International Broth. of Elec. Workers, Local Union No. 8, AFL-CIO v. C & M Elec.*, 734 F. Supp. 285 (N.D. Ohio 1990). In addition, the Sixth Circuit has applied the *Retail Clerks* standard to accept jurisdiction over contracts other than collective bargaining agreements between an employer and a union representing its own employees, *District 2, Marine Engineers Beneficial Ass'n, AFL-CIO v. Amoco Oil Co.*, 554 F.2d 774 (6th Cir. 1977), but not to accept jurisdiction over contracts between employers and unions representing the employees of other employers..

Federal caselaw, therefore, supports the conclusion that § 301 provides a federal cause of action for disputes arising from (1) collective bargaining agreements between an employer and a union representing its own employees and (2) other contracts between an employer and a union representing its own employees when those contracts govern the

8

terms and conditions of the employer's relations with its union employees. The current dispute arising from the Agreement does not enjoy federal jurisdicition pursuant to § 301 because it is neither a collective bargaining agreement nor a contract between an employer and a union representing its own employees. Rather, it is a contract between an employer and a union representing the employees of a subcontractor of the employer.

Plaintiffs cite *Chicago Dist. Council of Carpenters Pension Fund v. Strom*, 634 F. Supp. 163 (N.D. Ill 1986), for the proposition that contracts between an employer and a union representing the employees of a subcontractor may be governed by § 301. In that case, a general contractor guaranteed a subcontractor's payment of salary and fringe benefits to a union representing the subcontractor's employees. The court found that this guarantee made the contractor an "employer" of those employees within the meaning of § 301. The court found, therefore, that it had jurisdiction over disputes arising from the contract that embodied the guarantee. Plaintiffs rely on *Strom* to support their argument that Knoch's Agreement with the Local 7 and the Funds Office in the present case brings the Agreement within the ambit of § 301, thus giving this court jurisdiction over the parties' dispute.

As defendant points out, however, there are two problems with applying *Strom* to the present case. First, Knoch gave no guarantee to plaintiffs that Pustelak would make payments it owed plaintiffs. Rather, Knoch agreed to a certain procedure for payment once money was owed Pustelak. As the guarantee was the crux of the decision to accept jurisdiction in *Strom*, this distinction alone is fatal to plaintiffs' argument. Second, *Strom* is an outlier in § 301 jurisprudence because it relies on bad law. *Strom* relied on principles culled from *Hearst* which had been superceded by Congressional amendment and

9

subsequent caselaw. For example, relying on *Hearst*, *Strom* stated, "Common-law categories of 'employee,' 'subcontractor' and 'independent contractor' do not control federal labor-relations cases." *Strom*, 634 F. Supp. at 169. This contradicts the Supreme Court's holding in *United Ins. Co.*, cited above, and it ignores the Congressional amendment of the LMRA. As *Strom* is factually distinguishable from the present case, relies on outdated law, and reaches a conclusion that no other court has reached, this court will not be guided by *Strom*. Plaintiffs have failed to prove that this court has subject matter jurisdiction over this case.

The Agreement is not a contract between an employer and its own employees. For that reason, Knoch is not an "employer" within the meaning of § 301, and a federal cause of action based on disputes arising from the Agreement may not be asserted pursuant to § 301. Consequently, this court does not have subject matter jurisdiction over this case by virtue of § 301. As neither party contends that the court has subject matter jurisdiction over this case for any other reason, this court finds that it lacks subject matter jurisdiction to hear this cause.

IV.

For the reasons given above, this court lacks subject matter jurisdiction to hear this case. The court, therefore, **GRANTS** Knoch's motion to dismiss pursuant to R. 12(b)(1) and dismisses the case without prejudice.

**IT IS SO ORDERED.**

Date: February 24, 2012	s/ *Nancy A. Vecchiarelli*
	NANCY A. VECCHIARELLI
	UNITED STATES MAGISTRATE JUDGE